**SO ORDERED.**

**SIGNED this 06 day of December, 2012.**

_____
Randy D. Doub
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
NEW BERN DIVISION

IN RE:

WIGGINS FARMS, INC.,                       CHAPTER 11
                                           CASE NO.  12-02651-8-RDD
      DEBTOR

**ORDER DENYING CONFIRMATION OF CHAPTER 11 PLAN**

Pending before the Court is the Plan of Reorganization (the "Plan") and the Disclosure statement filed by Wiggins Farms, Inc. (the "Debtor") on August 24, 2012, the Amendment to Chapter 11 Plan filed by the Debtor on October 2, 2012, the Objection to Confirmation of Chapter 11 Plan filed by Crop Production Services, Inc. on October 3, 2012,  the Response to Confirmation of Plan and Approval of Disclosure Statement filed by the Bankruptcy Administrator on October 22, 2012, the Objection to Confirmation of Chapter 11 Plan filed by Branch Banking and Trust Company ("BB&T") on October 22, 2012, and the Objection to Confirmation of Chapter 11 Plan filed by AgCarolina Financial, ACA ("AgCarolina") on October 22, 2012.  The Court conducted a hearing on October 29, 2012, in Wilson, North Carolina to consider the Plan, the Disclosure Statement and the responses and objections thereto.

## BACKGROUND

On April 4, 2012, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. "The Debtor owns a multiple generational family farm specializing in managing commercial swine and poultry growing contracts, as well as leasing farm equipment for crop production in Lenoir and Wayne Counties." Disclosure Statement at 7, *In re Wiggins Farms, Inc.*, No. 12-02651-8-RDD (Bankr. E.D.N.C. Aug. 24, 2012). The Debtor intends to operate as a debtor in possession through continued operation of the farm, which consists of equipment lease payments from JSBF Partnership ("JSBF") and management fees from poultry and swine contracts.

The Debtor's primary secured creditor is AgCarolina pursuant to seven (7) promissory notes. AgCarolina is secured by the Debtor's real property and equipment. Further, AgCarolina claims a security interest in the Debtor's contract rights, accounts receivable, and other personal property assets. The approximate aggregate of the seven (7) loans as of the petition date was $2,364,327.00 not including AgCarolina's accrued legal fees and costs.

The Debtor's Plan consists of twenty-five (25) classes. The approximate total of general unsecured claims is $505,989.32, which the Debtor proposes to pay in full. As of the hearing date, all creditors had submitted accepting ballots or failed to submit ballots, with the exception of AgCarolina which filed a ballot rejecting the Plan.

As to AgCarolina, the Plan proposes to treat the claims as fully secured in the amount of $2,364,327.00 with the balance amortized over twenty-five (25) years at an annual interest rate of 4.5%. The Plan proposes that the Debtor make quarterly payments of $39,504.83 with the entire principal and unpaid interest due seven (7) years from the effective date of the Plan. The Plan further provides that during the loan repayment period, the Debtor shall be permitted to sell any equipment

securing its loans with AgCarolina. If such a sale should occur, AgCarolina shall release its lien in exchange for payment of 25% of the net proceeds resulting from the sale.

The Debtor's projections for November 2012 through October 2013 (the "Projections") provide its total revenue per month will be approximately $115,000.00. Of that amount, JSBF is projected to pay $90,000.00 per month, James T. Wiggins and Maria L. Wiggins are projected to pay $20,000.00 per month and the Debtor's trucking income consists of $5,000.00 per month. The Debtor's monthly reports show from May through September, JSBF has paid approximately $59,400.00 per month to the Debtor.

AgCarolina objects to the Debtor's Plan on the grounds that: (1) the Plan is not feasible; (2) the Plan is not fair and equitable; (3) AgCarolina is an oversecured creditor entitled to payment of interest and reasonable fees, costs and charges, including attorneys' fees, pursuant to 11 U.S.C. § 506(b) and the Plan does not provide for the payment of these fees; (4) the Plan fails the best interest of creditors test; and (5) Class 25 of the Plan violates the absolute priority rule by allowing the Debtor's equity owners to retain their interests unimpaired when payment of other creditors is stretched over time and there is no security for repayment of unsecured creditors' claims.

## DISCUSSION

Section 1129(a)(1) provides that a court shall confirm a debtor's plan of reorganization only if the plan complies with the applicable provisions of this title. 11 U.S.C. § 1129(a)(1). Section 1129(a)(11) of the Bankruptcy Code requires that in order for a plan to be confirmable, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This requirement is often called the feasibility

requirement. *In re A.H. Robins, Co., Inc.* 880 F.2d 694, 698 (4th Cir. 1989). The question of feasibility is a question of fact in which the debtor bears the burden to show feasibility of the plan by a preponderance of the evidence. *In re Investment Co. Of Southwest, Inc. (F.H. Partners, L.P. v. Investment Co. of Southwest, Inc., Four Hills Associates, and Bank of America)*, 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006). Feasibility is "firmly rooted in predictions based on objective fact." *In re Cheatham*, 78 B.R. 104, 109 (Bankr. E.D.N.C. 1987); *In re Investment*, 341 B.R. at 310.

*In re Piece Goods Shops Company, L.P./Piece Goods Shops Corp.*, the Bankruptcy Court for the Middle District of North Carolina set forth factors a court may consider in assessing feasibility. 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995). These factors include "the capital structure of the reorganized [d]ebtors, their projected earning power, economic conditions, management's ability and likelihood of continuing to work for the reorganized [d]ebtors, and any other factors relevant to the performance of the [p]lan." *Id.* (citing *In re Polytherm Industries, Inc.*, 33 Bankr. 823 (W.D. Wis. 1983)).

The Court finds the Debtor has not proven by a preponderance of the evidence that the Plan is feasible within the meaning of § 1129(a)(11). The Court has concerns with the ability of the Debtor to fund the proposed plan payments. The monthly reports to date do not show feasibility. According to the Debtor's Projections, JSBF is to pay $90,000.00 per month to the Debtor, which consists of approximately 78% of the Debtor's projected monthly income. Presently there is no written contract with JSBF. The Debtor's monthly reports show that since the petition date, JSBF has paid on average approximately $59,400.00 per month to the Debtor. The Plan and Disclosure Statement are devoid of any information regarding JSBF's ability to make the projected payments of $90,000.00 per month. At the hearing, James Scott Wiggins, Vice President of the Debtor,

4

testified on behalf of the Debtor. Mr. Wiggins testified that JSBF is a partnership that is involved in the business of crop production. Mr. Wiggins testified that he, his father, James T. Wiggins, and his brother, Brent Wiggins are the partners of JSBF. He testified that the partners and a family friend, Randy Riggs, fund JSBF. Mr. Wiggins was unable to recall how much the partners and Mr. Riggs had paid into JSBF in the years 2011 and 2012. He testified however, that he believed JSBF was capable of making the projected monthly payments of $90,000.00 to the Debtor and that JSBF would have a cash balance of $400,000.00 beginning in 2014. Mr. Wiggins clarified that the $400,000.00 figure takes into account possible proceeds JSBF may recover based on a crop loss claim that it intends to file by the end of 2012. Mr. Wiggins represented that in 2012, Randy Riggs loaned approximately $700,000.00 to JSBF. JSBF does not have any commitment in writing from Mr. Riggs to continue lending funds to JSBF. Mr. Wiggins testified that Mr. Riggs has however verbally committed to loan to JSBF any funds it may need to further its operations.

As to Mr. Riggs, the Plan provides that the claim of Mr. Riggs in the amount of $125,000.00 is to be treated as a secured obligation amortized over twenty-five (25) years at 4.5% interest with the first quarterly payment to begin on the fourth anniversary of the effective date of the Plan. Accordingly, the Debtor's Projections do not take into account payments to Mr. Riggs. Mr. Wiggins testified that he did not know any information as to Mr. Riggs' income or his ability to continue loaning funds to JSBF for the upcoming year. Further, Mr. Wiggins did not know JSBF's net income for the years of 2011 and 2012. Likewise, Mr. Wiggins was unsure of his ability and the ability of James T. Wiggins and Brent Wiggins to continue funding JSBF. Mr. Wiggins represented that he and his father James T. Wiggins are currently Debtors in separate Chapter 11 proceedings.

The Court finds the Debtor has failed to show the confirmation of the plan will not likely be followed by liquidation or the need for further reorganization. The Plan, Disclosure Statement, and evidence presented at the hearing do not provide information regarding JSBF's income or ability to make contributions to the Debtor. JSBF and the Debtor have not entered into any written contracts requiring JSBF to continue contributing to the Debtor. Even if such contracts existed, the Debtor has failed to produce any information regarding JSBF's income and its ability to fund the Debtor's Plan. "Because the success of the Debtor's chapter 11 case is clearly contingent on [JSBF's contributions], in order to provide adequate information, Debtor must disclose information regarding [JSBF's] financial situation that shows [its] ability to make such contributions." *In re Construction Supervision Services, Inc.*, Case No. 12-00569-8-RDD (Bankr. E.D.N.C. Oct. 1, 2012) (quoting *In re Forest Grove, LLC,* 448 B.R. 729, 735 (Bankr. D.S.C. March 3, 2011) (citing *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D.Ill. 2005) (holding that debtor company's president's declaration that his wife would contribute needed capital to the debtor was "sheer speculation and wishful thinking" in the "absence of any form of corroboration or contract from the alleged sources of the [] funds" and therefore could not satisfy feasbility requirement for plan confirmation); *In re Wiston XXIV*, *Ltd. P'ship*, 153 B.R. 322, 327-28 (Bankr. D. Kan.1993) (holding that plan was not feasible in spite of general partner's promise to contribute $100,000.00 because the general partner showed no proof he could actually make the payment)). Here, the Debtor has failed to show the Plan is feasible.

A proposed plan must be "fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(2) sets forth the standards a plan must meet to be considered "fair and equitable." However, these requirements are

not exclusive. Even if a plan meets the standards of 11 U.S.C. § 1129(b)(2), it can still be considered not "fair and equitable" and, therefore, nonconfirmable. *In re EFH Grove Tower Associates*, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989) (citing *In re Matter of D&F Construction Co.*, 865 F.2d 673, 675 (5th Cir. 1989); *In re Cheatham*, 78 B.R. 104 (Bankr. E.D.N.C. 1987), *aff'd* 91 B.R. 377 (E.D.N.C. 1988)). For a plan to be "fair and equitable," the plan must literally be fair and equitable.

The Court finds the Debtor has failed to prove by a preponderance of the evidence that the Plan is fair and equitable with respect to AgCarolina.

AgCarolina contends the plan is not fair and equitable because it forces AgCarolina to combine all seven (7) loans into one loan with an extended amortization period and a reduced interest rate. AgCarolina contends that each of the seven (7) obligations were obtained by the Debtor for a different purpose and the repayment terms were formulated based on the status of each loan. AgCarolina contends this places too much risk on AgCarolina and changes the benefit of the bargain previously agreed to by the parties. Further, AgCarolina contends the Plan's proposed seven (7) year balloon is not reasonable and is not available to other similarly situated borrowers.

In lieu of additional testimony, during the hearing the parties stipulated as to valuations given to the equipment and real property collateral by the Debtor and AgCarolina. Pursuant to the stipulations, the Debtor values the real estate secured by the loans at $4,378,864.00 and values the equipment secured by the loans at $4,706,000.00 minus $1,900,000.00 in purchase money security interests, with a total value of assets being $7,018,864.00. Pursuant to the stipulations, AgCarolina values the real estate at $3,485,000.00 and the equipment at $3,544,200.00, with a total value of

assets being $7,029,000.00. The equipment value amount includes roughly $500,000.00 in missing equipment.

At the hearing, Christopher Rodwell testified on behalf of AgCarolina. He has been an employee of AgCarolina Farm Credit since 1983 and for the past twenty-five (25) years his primary job responsibility has been to evaluate AgCarolina Farm Credit collateral in eastern North Carolina. AgCarolina is a subsidiary of Farm Credit. Mr. Rodwell testified that he is licensed as a North Carolina Real Estate Broker and is certified as a general real estate appraiser in North Carolina. Mr. Rodwell inspected the equipment and real property on January 19, 2012, and then prepared a personal property valuation of the Debtor's equipment and a Uniform Agricultural Appraisal Report of the Debtor's real property. Mr. Rodwell testified that he valued the equipment at $3,544,200.00. He explained that multiple pieces of equipment were missing and that although he was unable to inspect the missing equipment, he nevertheless included the values of the missing pieces of equipment in his valuation. As to the missing equipment, Mr. Rodwell made an assumption that the equipment was in good condition based on the fact that the equipment he was able to inspect was in good condition. Mr. Rodwell further testified that farm equipment depreciates fairly quickly, with seven (7) to ten (10) years being the useful economic life.

In addition, Mr. Rodwell conducted a valuation of the Debtor's real property denoted as the Headquarters with Swine Finishing and Turkey Production (the "Headquarters") and the Razorback Finishing Farm ("Razorback Farm"). These are swine and turkey production buildings. He valued the Headquarters at $1,325,000.00 and the Razorback Farm at $1,280,000.00. He testified that as of January 19, 2012, the remaining economic life of the Headquarters was fifteen (15) years and the remaining economic life of the Razorback Farm was twelve (12) years.

Mr. James "Danny" Alexander, an officer of special asset management with AgCarolina, also testified on behalf of AgCarolina. Mr. Alexander testified that the maturity dates, balances and interest rates of the seven notes are as follows:

| Note Number | Balance as of Petition Date | Interest Rate | Maturity Date |
|---|---|---|---|
| 02 | $752,461.85 | 7.40% | 10/1/11 |
| 03 | $211,008.96 | 5.75% | 1/1/13 |
| 04 | $101,736.46 | 5.75% | 1/1/13 |
| 05 | $249,640.63 | 6.00% | 1/1/13 |
| 06 | $116,722.26 | 6.75% | 1/1/13 |
| 07 | $831,268.71 | 6.95% | 1/1/18 |
| 08 | $101,438.13 | 7.40% | 1/1/11 |

Mr. Alexander testified that he visited the Debtor's site to inspect the equipment on or about January 19, 2012. He testified that there were pieces of equipment that were missing and that James Scott Wiggins did not have a satisfactory explanation as to where the missing pieces of equipment were located. He further testified that additional pieces of equipment were sold, transferred or traded without AgCarolina's consent subsequent to his site visit. Mr. Alexander represented that the total value of equipment that was sold, transferred or traded without AgCarolina's consent totaled approximately $1,151,000.00.

Based on the Debtor's nature and use of the collateral resulting in constant depreciation of the value of the collateral along with the treatment of AgCarolina's claim, the Court finds that the Plan is not fair and equitable with respect to AgCarolina. The Court finds the equipment and real property is likely to depreciate at a rate higher than the Debtor anticipates. Further, multiple pieces

of equipment are missing and have not been accounted for. The Plan does not provide a market rate of interest for the type of equipment and real property collateral at hand which will continue to depreciate. Six (6) of the AgCarolina loans will mature on or before January 1, 2013. The terms proposed by the Debtor are not reasonable and do not resemble the current market conditions for loans of this nature.

## CONCLUSION

Accordingly, the Court holds that the Plan does not satisfy the requirements of § 1129. Therefore, confirmation of the Plan is **DENIED**. The Debtor may file an amended plan and amended disclosure statement.

**END OF DOCUMENT**